UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA
CASE NO.

CHAD HOPKINS and
PHYLLIS NUGENT, on their own
behalf and for all others similarly situated,

      Plaintiffs,

v.

OCWEN FINANCIAL CORPORATION,
OCWEN LOAN SERVICING, LLC,
ALTISOURCE PORTFOLIO
SOLUTIONS, S.A.,
ALTISOURCE SOLUTIONS, INC., and
WILLIAM ERBEY,

      Defendants.

_____/

## COMPLAINT

## INTRODUCTION

1.     Plaintiffs bring this class action on behalf of themselves, and a nationwide class of similarly situated individuals (the "Class") as set forth below.

2.     This case involves the actions of Defendants Ocwen Financial Corporation and Ocwen Loan Servicing, LLC (collectively "Ocwen"), its Executive Chairman, William Erbey, and related companies, affiliates, contractors (including the "Altisource" defendants) and agents. Ocwen services residential mortgage loans.

3.     Defendants have engaged in a nationwide scheme of illegal, unfair, unlawful, and deceptive business practices that violate both federal and state law in the servicing of home-secured loan transactions and in the provision of certain related services, including debt collection and foreclosure services. This scheme is carried out by means of a centrally controlled set of policies and practices and is implemented with form documents, form notices and uniform accounting mechanisms.

                CLASS ACTION COMPLAINT

4.      Defendants have created business practices that allow them to profit from the misery of homeowners facing foreclosure and to siphon off money that the homeowners could use to cure their defaults.

5.      Foreclosures are so profitable for Ocwen that it is routinely indifferent to circumstances in which its own mistakes and/or overcharges generate or exacerbate a homeowner's default.

6.      Ocwen's overseas call centers are designed to frustrate customer inquiries rather than to provide customers with meaningful information and assistance.  Overseas employees do not have access to information present in Ocwen's records necessary to respond to or resolve customer inquiries and problems. It often takes many weeks or months for homeowners to reach an Ocwen employee with authority to resolve servicing problems, during which time additional late fees and default and delinquency charges typically arise.

7.      There are four business practices at the heart of this complaint:

a.      Defendants routinely seek to collect, and do collect late charges that are not due from homeowners under mortgages, deeds of trust and/or loan notes (collectively referred to herein as "Loan Contracts") in connection with the loans it services;

b.      Based on a scheme designed by Defendant Erbey to maximize his profits from a web of related businesses, the Ocwen Defendants routinely pay the Altisource Defendants marked-up fees to perform work on delinquent accounts including, without limitation, above market fees for force-placed hazard insurance, inspection fees, appraisals, broker's price opinions, title services, and auction services.  Ocwen then passes unreasonable marked up charges on to homeowners in violation of Loan Contracts in connection with the loans it services;

c.      The Ocwen Defendants routinely charge a fee they denominate "prior servicer advances" on loans it acquires for servicing from other servicers without adequate proof that such sums are due and owing based on work done by the prior

servicer. These fees are not due and owing from homeowners under the terms of their Loan Contracts; and

       d.    The Ocwen Defendants routinely fail to properly account for escrows that are required under homeowners' Loan Contracts.

8.    Each of the actions complained of herein is undertaken by the Defendants to generate illegal or improper revenue for one or more of them.  Such actions are not undertaken on behalf of the mortgage holders for whom the Defendants service loans.

9.    Ocwen routinely treats borrowers as in default on their loans even though the borrowers have tendered timely and sufficient payments or have otherwise complied with mortgage requirements or applicable law.

10.    The Defendants have engaged in a regular pattern of violations of the Fair Debt Collection Practices Act, 15 U.S.C. §§ 1692, *et seq.* ("FDCPA"), with respect to unlawful collection practices, collecting or seeking to collect amounts not legally due and owing, failing to provide required disclosures in collection letters, and harassing borrowers.

11.    The Defendants' practices are misleading, deceptive and/or unfair under state law including under, without limitation, Florida's Deceptive and Unfair Trade Practices Act (FDUTPA) (F.S. §501.201 et seq.) and the Illinois Consumer Fraud Act (ICFA) (815 ILCS 505/2).

12.    The practices described herein also violate contract law and the common law in each of the states in which the Defendants do business.

13.    In addition to damages, Plaintiffs seek injunctive and/or declaratory relief to prevent recurrence of the challenged conduct, and to assure uniform standards of future servicing of loans and equitable relief and damages for themselves and the Class generally, including restitution and disgorgement of funds obtained by Defendants in violation of state and federal law.

      CLASS ACTION COMPLAINT

## SUBJECT MATTER JURISDICTION AND VENUE

14.     This Court has jurisdiction over Plaintiffs' federal claim pursuant to 28 U.S.C. § 1331, and 15 U.S.C. § 1692k. The Court has jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. ¶1367.

15.     The Court also has jurisdiction over this matter pursuant to 28 U.S.C. §1332(d) because this class action is between citizens of different states; at least one member of the class of Plaintiffs is a citizen of a state different from the Defendant; a class action has been pled; the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs; and there are 100 or more members in the proposed classes. 28 U.S.C. § 1332(d).

16.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because the unlawful practices complained of emanate from this District; Ocwen Financial Corp. maintains offices and representatives in this District; and each defendant regularly conducts business in this District.

17.     All conditions precedent to filing this Complaint have occurred, been performed, or been waived.

## PARTIES

### Plaintiffs

18.     Plaintiffs Chad Hopkins and Phyllis Nugent are residents and citizens of Illinois whose home-secured loan was serviced by Ocwen during the period covered by this consolidated action.

19.     Defendant Ocwen Financial Corporation is a publicly held Florida financial services company that is based in West Palm Beach, Florida. This Court has personal jurisdiction over Ocwen Financial because, among other things, it is a Florida corporation registered with the Florida Secretary of State, Division of Corporations, to conduct business in Florida. Ocwen Financial performs substantial business in Florida.

20.     Defendant Ocwen Loan Servicing, LLC is a separately incorporated subsidiary of Ocwen Financial Corporation that is based in West Palm Beach, Florida. This Court has

personal jurisdiction over Ocwen Loan Servicing because, among other things, it is registered with the Florida Secretary of State, Division of Corporations, to conduct business in Florida. Ocwen Loan Servicing performs substantial business in Florida.

21.     Ocwen maintains its principal call centers in India, the Philippines and Uruguay. More than three quarters of its employees' are located in one of those three countries.

22.     Defendants Ocwen Financial Corporation and Ocwen Loan Servicing, LLC are referred to collectively herein as "Ocwen."

23.     Defendant Altisource Portfolio Solutions S.A. is a publicly held affiliate of Ocwen Financial Corporation, incorporated in Luxembourg, with a principal place of business in the United States in Atlanta, Georgia.  This Court has personal jurisdiction over Altisource Portfolio Solutions because, among other things, it performs substantial business in Florida.

24.     Defendant Altisource Solutions, Inc. is a separately incorporated affiliate of Ocwen Financial Corporation and subsidiary of Altisource Portfolio Solutions with a principal place of business in Atlanta, Georgia.  This Court has personal jurisdiction over Altisource Solutions because, among other things, it is registered with the Florida Secretary of State, Division of Corporations, to conduct business in Florida.   Altisource Solutions performs substantial business in Florida.

25.      Defendants Altisource Portfolio Solutions and Altisource Solutions are referred to collectively herein as "Altisource."

26.     Ocwen is Altisource's largest customer, representing approximately 60% or more of Altisource's income.

27.     The Chairman of Altisource, William Erbey is the Executive Chairman of Ocwen.

28.     Altisource and Ocwen share employees.

29.     Altisource does business in its own name and also, in part, as "Hubzu" and/or "Hubzu.com."

30.     William Erbey is the Executive Chairman of Ocwen and the Chairman of Altisource.  On information and belief, Mr. Erbey has a home in Florida. This Court has personal

CLASS ACTION COMPLAINT

jurisdiction over Mr. Erbey because he frequently lives at his Florida home and because he conducts substantial business in Florida.

31.     At all times relevant to this complaint, Erbey participated in, directed and controlled the business practices at issue including, without limitation, the servicing policies and procedures implemented at Ocwen and the business strategy involved in spinning off Altisource so that it could charge above-market prices for default and delinquency-related services to Ocwen which could then be passed on to homeowners under the terms of Loan Contracts.

### Agency/Joint Venture

32.     At all times relevant to this Complaint, Defendants, both individually and collectively, together with affiliates not herein named, are and were agents or joint venturers of each of the other Defendants, and in doing the acts alleged herein were acting within the course and scope of such agency.  Each Defendant had actual and/or constructive knowledge of the acts of each of the other Defendants, and ratified, approved, joined in, acquiesced in, and/or authorized the wrongful acts of each co-Defendant, and/or retained the benefits of said wrongful acts.

### Aiding and Abetting

33.     At all times relevant to this Complaint, Defendants, both individually and collectively, together with affiliates not herein named, aided and abetted, encouraged, and rendered substantial assistance to the other Defendants in breaching their obligations to Plaintiffs, as alleged herein.  In taking action, as alleged herein, to aid and abet and substantially assist the commissions of these wrongful acts and other wrongdoings complained of, each of the Defendants acted with an awareness of its primary wrongdoing and realized that its conduct would substantially assist the accomplishment of the wrongful conduct, wrongful goals, and wrongdoing.

### Conspiracy

34.     At all times relevant to this Complaint, Defendants, both individually and collectively, together with affiliates not herein named, knowingly and willfully conspired,

CLASS ACTION COMPLAINT

engaged in a common enterprise, and engaged in a common course of conduct to accomplish the wrongs complained of herein.  The purpose and effect of the conspiracy, common enterprise, and common course of conduct complained of was, *inter alia*, to financially benefit Defendants at the expense of Plaintiffs by engaging in fraudulent activities.  Defendants accomplished their conspiracy, common enterprise, and common course of conduct by misrepresenting and concealing material information regarding the servicing of loans, the relationships among them and by taking steps and making statements in furtherance of their wrongdoing as specified herein.  Each Defendant was a direct, necessary and substantial participant in the conspiracy, common enterprise and common course of conduct complained of herein, and was aware of its overall contribution to and furtherance thereof.  Defendants' wrongful acts include, *inter alia*, all of the acts that each of them are alleged to have committed in furtherance of the wrongful conduct complained of herein.

35.     Plaintiffs are informed and believe that the above-described conspiracy is ongoing, making it pointless for Plaintiffs to allege when the last overt act of the conspiracy occurred.

## **GENERAL FACTS**

### **Factual Background**

36.     Ocwen is a servicer of single-family mortgages, including the mortgages of the plaintiffs and the putative class members.  In the servicing industry, "single family mortgages" include mortgages on one to four-family dwelling units.

37.     A "servicer" is responsible for mortgage administration activities, known as servicing activities, which generally include collecting payments from mortgagors; applying payments made in an order, called for by the relevant contractual agreements, to the mortgagor's indebtedness; distributing payments after allowable deductions, for amounts such as late charges, force-placed hazard insurance, and default and delinquency related advances to third parties, and pursuing collections from delinquent borrowers.

38.     A servicer, such as Ocwen, that does not originate a mortgage loan may become the servicer by purchasing the "mortgage servicing rights" associated with the loan or by entering into a contract with the "master servicer" to act on its behalf as "subservicer." Such transfers can occur at various stages of repayment of the mortgage, including where the borrower is delinquent in payments.

39.     Ocwen currently services more than $125 billion dollars in single-family residential loans per Ocwen's website, *available at* http://www.ocwen.com/residential-servicing-why-choose-ocwen (last viewed on Sept. 15, 2014).

40.     Many of the loans Ocwen acquired for servicing were originated as subprime loans between 2000 and 2010, often on predatory terms or at above-market interest rates.

41.     Indeed, Ocwen is the nation's largest subprime mortgage servicer, managing more than one-quarter of outstanding subprime loans in the U.S.  Horwitz, Jeff, *Mortgage Servicers Go to Extreme Lengths to Skirt New Regulations*, PBS NewsHour, Jul. 31, 2014, *available at* http://www.pbs.org/newshour/rundown/mortgage-servicers-create-multi-million-dollar-shell-companies-skirt-regulations/ (last viewed on September 16, 2014).   For the 2013 fiscal year, Ocwen serviced 834,734 subprime loans with an unpaid principal balance of $146 billion dollars.  Ocwen Financial Corp., Amended Annual Report (Form 10-K/A), at 44 (Aug. 18, 2014).  As of June 30, 2014, Ocwen claims to service 770,415 subprime loans with an unpaid principal balance of $131.8 billion dollars.  Ocwen Financial Corp., Quarterly Report (Form 10-Q), at 59 (Aug. 18, 2014).

42.     Ocwen typically acquires the servicing rights to mortgage loans that were originated by a third party. The applicable servicing transfer agreements provide that Ocwen acquires the unilateral right to make decisions about late fees and other default and delinquency charges that can be recovered under loan agreements being transferred to it for servicing. Ocwen ultimately exercises full discretion to initiate processes that generate the late fees, force-placed hazard insurance charges and default and delinquency charges that it passes on to borrowers under Loan Contracts.

CLASS ACTION COMPLAINT

43.     Ocwen advances force-placed hazard insurance charges, as well as other default and delinquency charges, where paid to third parties, and retains the right to recover the amounts advanced from borrowers.

44.     On obtaining servicing rights pursuant to servicing transfer agreements, Ocwen is assigned rights and is delegated obligations under the applicable loan contracts that govern its relationships with the Plaintiffs and the class. These assignments of rights and delegations of duties create privity between Ocwen and the borrowers with respect to the loan contracts it services within the meaning of the law.

45.     In its amended annual report filed with the SEC for 2013, Ocwen states that by using the latest technology and scientific principles allows them to focus on "each individual borrower [to] create a 'market of one' that is focused on the unique needs of each borrower[]" resulting in Ocwen's ability to "increase borrower acceptance rates of loan modifications and other resolution alternatives while at the same time lowering re-default rates." Ocwen Financial Corp., Amended Annual Report (Form 10-K/A), at 6 (Aug. 18, 2014).  Additionally, Ocwen maintains that it is able to keep families in their homes by using "new technology that incorporates consumer psychology to reduce [its] cost of servicing, improve customer service and enhance [its] ability to manage defaults." *Id.* at 3.

46.     Contrary to its representations, when Ocwen takes over loans, it routinely breaches the loan agreements by, among other things, improperly charging late fees, overcharging for force-placed hazard insurance and default and delinquency related services, failing to honor its obligation to maintain escrow accounts and charging for purported advances made by other servicers after acquiring servicing portfolios without adequate proof or basis for those charges.

47.     Ocwen's business model is to maximize revenues from loans in default without regard to whether it has a legal basis for the amounts it claims due.  Among other things it churns or mismanages delinquent accounts to exacerbate late fees, to profit from force-placed hazard

CLASS ACTION COMPLAINT

insurance policies and to generate income generated by providing default and delinquency services.

48.     In addition, because the amounts that it pays for third-party default, delinquency and foreclosure related services performed by its affiliate, Altisource, are priced above market rates and are passed through to homeowners under the terms of Loan Contracts, its practices undermine homeowners' ability to resolve their defaults and lead to additional profit to one or more of the Defendants.

49.     The scheme implemented by Defendants is designed to defraud homeowners and enrich Defendants.

### Ocwen Has Engaged In A Pattern And Practice Of Assessing and Collecting Unlawful Late Charges In Breach of Contract And Other Relevant Law

50.     Ocwen is in the business of servicing loans initiated through other mortgage lenders.  It frequently acquires servicing rights to risky mortgages, many of which were made on predatory terms.  Many of the mortgages serviced by Ocwen were in default when Ocwen acquired them for servicing.

51.     Mortgages, deeds of trust and loan notes are contracts that uniformly provide that late charges are due when a monthly payment is late.

52.     The provisions of the Loan Contracts used in connection with residential home mortgages uniformly provide for a late fee when a "monthly payment" or "installment" is paid after its due date.

53.     After acceleration of the loan balance the entire loan balance is due. Thereafter, the borrower is no longer entitled to make monthly payments or installment payments in any amount as a matter of contract and applicable law.  There is no ongoing due date for partial payments of the loan.

54.     Absent a late monthly payment or installment, there is no legal or contractual basis under a mortgage, deed of trust or loan note for a servicer to impose a late charge.

CLASS ACTION COMPLAINT

55.     Ocwen has engaged in a pattern and practice of charging monthly late fees after acceleration of the loan balance in breach of contract and applicable state law.

56.     The revenue generated from late fees is included in Ocwen's servicing revenue. Id. at F-12 ("We earn fees for servicing mortgage loans. We collect servicing fees … from the borrowers' payments. We also include late fees, prepayment penalties, float earnings and other ancillary fees in servicing revenue. We recognize servicing fees as revenue when the fees are earned which is generally when the borrowers' payments are collected or when loans are modified or liquidated through the sale of the underlying real estate collateral or otherwise.")

57.     The illegal late charges are paid to Ocwen by borrowers when they enter into loan modifications, reinstate their mortgages, sell their homes or otherwise pay-off their loan balance. Id. See also Ocwen Financial Corp., Amended Annual Report (Form 10-K/A), at 49 (Aug. 18, 2014) ("The increase in modifications contributed to revenue growth because when we return a loan to performing status we generally recognize any deferred servicing fees and late fees on the loan. ")

58.     In the alternative, Ocwen recovers the late charges from the proceeds of foreclosure sales of borrowers' homes. See ¶ 56, supra ("liquidated through the sale of the underlying real estate collateral").

59.     There are also tens of millions of dollars in unlawful Ocwen late fee assessments pending on borrowers' accounts.

60.     When paid, Ocwen, by contract with mortgage holders, retains the late charge payments and does not pass them through to mortgage holders.

61.     Ocwen claims that the late fees collected are a "significant component[] of the estimated future cash inflows for [Mortgage Servicing Rights]" in addition to "servicing fees… float earnings and other ancillary fees." Ocwen Financial Corp., Quarterly Report (Form 10-Q), at 22 (Aug. 18, 2014). As of the end of the second quarter in 2014, Ocwen reports it has already earned over $69 million dollars in servicing revenue in 2014 from late charges alone. Id. at 30, 58.

**Ocwen, Altisource And Erbey Have Engaged In A Joint Scheme To Overcharge Homeowners For Force-Placed Hazard Insurance and Default And Delinquency Services That Ocwen Purchases From Altisource at Above-Market Prices**

62.  Throughout the relevant time period, Defendants conspired to increase their financial profits by overcharging homeowners for force-placed hazard insurance and for foreclosure-related services including, without limitation, inspection fees, appraisals, broker's price opinions, title searches and auction services (collectively "Foreclosure-Related Services").

63.  Erbey is the Executive Chairman of Ocwen and the Chairman of Altisource.  In Ocwen's second quarter report of 2014 to the SEC states that as of June 30, 2014, Erbey owned or controlled approximately 13% of Ocwen common stock and approximately 27% of Altisource common stock.  Erbey directly benefited from Altisource charging Ocwen above-market rates for force-placed hazard insurance and for Foreclosure-Related Services.

64.  The cost of the inflated fees charged by Altisource to Ocwen is passed on to homeowners.

65.  Altisource provides or procures various mortgage servicing and Foreclosure-Related Services for Ocwen including, but not limited to: force-placed hazard insurance, title searches, inspection fees, appraisals, property inspections, insurance services, default management, and origination management.  Altisource Portfolio Solutions S.A., Quarterly Report (Form 10-Q), at 26 (July 29, 2014).  Altisource reports that for the first six months of 2014, their revenue from Ocwen, their largest customer, for the mortgage services segment of their business relationship was $266.4 million dollars, accounting for 67% of its revenue.  *See id.* at 8-9, 42.

66.  The New York State Department of Financial Services ("NY Department of Financial Services") has issued multiple letters to Ocwen detailing its concerns in Ocwen's business relationships and dealings with its affiliated companies, Altisource and Hubzu.

67.  The NY Department of Financial Services issued a letter to Ocwen on August 4, 2014, questioning Ocwen's mortgage servicing practices in its provision of force-placed

insurance transactions with Altisource.  The letter alleges that Ocwen's use of an unaffiliated insurance agent company acts as a means to funnel significant sums of money to Altisource for insurance commissions and certain fees requiring very little work without direct contact between Ocwen and Altisource.  Moreover, the letter alleges that this business arrangement was approved by a three-member committee at Ocwen, which consisted of only one member of Ocwen's Board of Directors, Erbey, causing concerns of improper self-dealing among the Defendants.  The NY Department of Financial Services requested Ocwen provide information and documents explaining: the nature of Altisource's services provided to the unaffiliated insurance agent; Ocwen's policies and procedures permitting approval of business transactions solely through the three-member committee and reviewing approvals of transactions with related companies; and whether Ocwen considered the impact of Altisource's high fees for increasing insurance premiums on financially troubled homeowners.

68.    The NY Department of Financial Services also highlighted its concern with Erbey's conflicting role as a member of the Board and largest shareholder of both Ocwen and Altisource approving transactions between these related companies and whether the rates charged by related companies to Ocwen are actually at a fair-market rate.

69.    In its April 21, 2014, letter to Ocwen, the NY Department of Financial Services expressed concern with Ocwen's business dealings with Altisource's business unit, Hubzu, which Ocwen uses as its principal online auction site for foreclosed homes.  The letter questions the 4.5% auction fee charged by Hubzu to Ocwen compared to Hubzu's auction fee as low as 1.5% for business in the open market.  These auction fees are passed on to the homeowners.  The letter states that due to the relationship among Ocwen, Altisource and Hubzu suggesting self-dealing, the marked up rates charged in the conflicted business transactions harm struggling homeowners whom ultimately pay the inflated auction fees.

70.    Altisource similarly charges Ocwen fees for Foreclosure-Related Services that are either above the price it charges its other customers or are above prices for similar or identical services available on the open market.

71.     Loan Contracts used in connection with mortgage loans that Ocwen services uniformly limit charges for delinquency and foreclosure related services to those that are "reasonable," "necessary" or "reasonable and necessary." Although the specific language of the limitation may differ from one form contract to the other, all forms used contain an applicable limitation that prevents a loan servicer from charging unreasonable or unnecessary amounts for force-placed hazard insurance, Foreclosure-Related Services and for other similar incidentals relevant to servicing delinquent mortgages.

72.     Defendants together mark the services up beyond the price for similar services available in the open market and above the price Altisource charges other customers.

73.     The above-market force-placed hazard insurance and Foreclosure-Related Service charges are repaid to Ocwen by borrowers when they enter into loan modifications, reinstate their mortgages, sell their homes, or otherwise pay-off their loan balance.

74.     In the alternative, Ocwen recovers the amounts it lays out from the proceeds of foreclosure sales of borrowers' homes.

75.     There are also tens of millions of dollars in above-market force-placed hazard insurance and Foreclosure-Related Service charges pending for payment on borrowers' accounts.

76.     When paid, Ocwen, by contract with mortgage holders, retains the payment for above-market force-placed hazard insurance and Foreclosure-Related Service charges and does not pass them through to mortgage holders.  See ¶ 56, *supra*.

### When it Acquires Loans in Default that Had Previously Been Serviced By Other Entities Ocwen Charges a Fee It Denominates "Prior Servicer Advances" Even Though it Has No Proof that the Amounts it Claims Due Are Owed

77.     In the last five years Ocwen has expanded significantly by acquiring servicing portfolios from many other companies, including, without limitation, Litton Loan Corporation, with which it merged in 2011.

78.     Ocwen has also acquired large servicing portfolios from other companies including, without limitation, Aurora Loan Services (2012), Saxon Mortgage (2012), and One West Bank.

CLASS ACTION COMPLAINT

79.     Many of the loans Ocwen acquired were in default at the time Ocwen acquired them for servicing.

80.     When acquiring a loan in default, Ocwen includes a lump sum it claims due on the account for delinquency related fees and charges.  It denominates that amount in its records as "Prior Servicer Advances."   As a matter of convenience to Ocwen the amount of Prior Servicer Advance is not broken down to denominate the nature of or reason for the advance.

81.     Ocwen fails to obtain records from prior servicers that provide a basis for the amounts claimed due as Prior Servicer Advances.

82.     When a borrower calls Ocwen or writes seeking information about the basis for a Prior Servicer Advance, Ocwen is unable to provide it.  Call center employees insist that they do not have access to the records and written requests are simply ignored.

83.     Ocwen passes along so-called "Prior Servicer Advances" in violation of contract and other applicable law, and even though it has no factual basis to assert that these amounts are actually owed.

84.     Ocwen maintains a secret policy under which it drops charges for Prior Servicer Advances for those sophisticated enough to obtain counsel to challenge them in Court, because it knows it cannot prove that Prior Servicer Advances are actually owed.

### Ocwen Advances Many of Its Schemes by Failing to Establish or by Mismanaging Escrow Accounts Required as A Term of Mortgage Loan Contracts.

85.     Some, but not all Loan Contracts require escrow accounts by their terms.  The required escrows typically require payments by the homeowner of the amounts necessary to cover hazard insurance and real estate taxes.

86.     Where required, proper accounting for escrow is mandated by the terms of the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. §§ 2605, 2609; and its implementing regulation (Regulation X), 24 C.F.R. § 3500.17.

87.     Ocwen routinely engages in the following misconduct with respect to required escrows:

CLASS ACTION COMPLAINT

      a.      Failing to establish escrows accounts required by contract;

      b.      Failing to properly and timely pay hazard insurance and real estate taxes as due from escrows, thus generating late fees, creating defaults and leading to insurance cancellations, imposition of expensive force-placed hazard insurance policies, tax penalties and tax sales;

      c.      Failing to properly account for amounts held in escrow when servicing is transferred to Ocwen;

      d.      Procuring a force-placed hazard-insurance policy at above market rates and/or by a policy that provides it with a kickback on property it knows or should know is already insured; and

      e.      Using amounts that the borrower pays for principal and interest improperly to cover escrow amounts, thereby generating a default in loan payments.

88.      Ocwen's deliberate or negligent mismanagement of escrow accounts leads to borrower defaults, necessitating late charges, force-placed hazard insurance, and Foreclosure-Related Service charges from which one or more of the Defendants benefit.

## NAMED PLAINTIFFS' FACTS

### Chad Hopkins and Phyllis Nugent

89.      Chap Hopkins and Phyllis Nugent ("Plaintiffs") own a home they use as their primary residence located at 13687 Lakeview Drive, Lewistown, Illinois 61542 ("Lewistown Residence").

90.      Plaintiffs have been residing in the Lewistown Residence for over 12 years and currently have two children, ages 10 and 12, who live with them. They have three adult children in their 20s who no longer live with them.

91.      Plaintiffs purchased the Lewistown Residence in 2002 with a loan they obtained from New Century Mortgage Corporation ("New Century").

92.     At the time, New Century was one of the largest subprime mortgage lenders in the country.  It filed bankruptcy in 2007.

93.     The New Century loan had a principal balance of $98,550.00 and a 9.75% fixed interest rate. The monthly mortgage payment was in the amount of $846.00.

94.     True and correct copies of the July 29, 2002 New Century note, an Illinois Single Family Nonconforming Fixed Rate Note, and mortgage, an Illinois Single Family Fannie Mae/Freddie Mac Uniform Instrument, are attached as Exhibits A, and B.

95.     Since on or about September 1, 2011, Plaintiffs' loan has been serviced by Ocwen.

96.     Immediately prior to Ocwen, Plaintiffs' loan was serviced by Litton Loan Corporation ("Litton"), a company that was acquired by Ocwen (and merged into it) in September, 2011.

97.     As successor by merger to Litton, Ocwen is responsible for Litton's liabilities, including those at issue in this case.

98.     A true and correct copy of Litton's August 15, 2011 Notice of Servicing Transfer is attached as Exhibit C.

99.     Beginning on September 1, 2002, Plaintiffs began making the required monthly payments under the note.

100.    In the fall of 2005, to obtain a lower interest rate on the loan, Plaintiffs applied for and received a Loan Modification Agreement from Litton ("Modification").

101.    A true and correct copy of the Modification is attached as Exhibit D.

102.    The Modification has an effective date of October 12, 2005, and identifies Deutsche Bank National Trust Company, as trustee under the Pooling and Servicing Agreement

CLASS ACTION COMPLAINT

dated as of October 1, 2002, Morgan Stanley Dean Witter Capital I Inc. Trust 2002-NCS ("Deutsche Bank") as the "Lender." Exhibit D.

103.    The Modification provides that the amount payable under the Note and the Security Instrument ("Unpaid Principal Balance") as of October 12, 2005, is $106,983.16, which consists of "…the amount(s) loaned to the Borrower by the Lender and any interest capitalized to date." Exhibit D.

104.    The terms of the Modification include an 8.00% fixed interest rate and monthly payments of principal and interest of $809.09, with a first payment due date of December 1, 2005. Exhibit D.

105.    The Modification requires the Borrower to, "…comply with all other covenants, agreements and requirements of the Security instrument, including without limitation, the Borrower's covenants and agreements to make all payments of taxes, insurance premiums, assessments, escrow items, impounds and all other payments that the Borrower is obligated to make under the Security Instrument…" Exhibit D, Paragraph 4.

106.    The Modification provides that, "[e]xcept as otherwise specifically provided in this Agreement, the Note and Security Instrument will remain unchanged, and the Borrower and Lender will be bound by, and comply with, all of the terms and provisions thereof, as amended by this Agreement." Exhibit D, Paragraph 5.

107.    Except for the monthly payment amount, interest rate and principal balance, none of the relevant contractual requirements set forth in the New Century note and mortgage was changed or amended by the Modification.

108.    Beginning on December 1, 2005, and thereafter, Plaintiffs began making the required monthly payments under the Modification.

CLASS ACTION COMPLAINT

### *Ocwen's Failure to Properly Manage Plaintiffs' Escrow Account*

109.    The New Century mortgage contains the following relevant provisions with respect to "Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges" at Paragraph 1:

> Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3.

Exhibit B.

110.    The New Century mortgage contains the following relevant provisions with respect to "Funds for Escrow Items" at Paragraph 3:

> Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) the taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property…[and] (c) premiums for any and all insurance required by Lender under Section 5…Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items…[a]ny such waiver may only be in writing…in the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require.
>
> Lender may, at any time, collect and hold Funds in an amounts (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA…Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA.
>
> If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Exhibit B.

CLASS ACTION COMPLAINT

111.   At all time relevant to this complaint, Plaintiffs maintained the required property insurance on the Lewistown Residence and made premium payments directly to the insurer. Litton and then Ocwen received quarterly verifications of property insurance from the insurance company when Plaintiffs paid.

112.   Even though Plaintiffs were making all of their required monthly payments, during the time that Litton serviced their loan account, Litton failed to establish an escrow account and to pay real estate taxes.

113.   Litton's failure to create an escrow account or notify the Plaintiffs of the amount due to cover escrow items as they came due led to a substantial delinquency on Plaintiffs' loan, which delinquency it transferred to Ocwen when Ocwen acquired servicing.

114.   When Ocwen acquired the servicing rights to Plaintiffs' loan account, it assumed responsibility for Litton's mismanagement of Plaintiffs' escrow account and continued to mismanage the escrow account by failing to notify the Plaintiffs in accordance with RESPA of the amounts required to satisfy pending escrow items, causing a further delinquency on the loan and generating additional default and foreclosure related fees and costs.

115.   After Ocwen acquired Plaintiffs' loan, by letter of October 11, 2011, it rejected Plaintiffs' September 2011 monthly mortgage payment on the basis that, "…the [funds] are not sufficient to satisfy the defaulted amount of your loan and no alternative payment arrangements have been agreed to…"

116.   The letter failed to recognize that the Plaintiffs had paid the principal and interest in the amounts billed by Litton every month and that the defaulted amount arose because of Litton and Ocwen's own failure to properly manage and bill for escrow items.  By the time

CLASS ACTION COMPLAINT

Litton and then Ocwen recognized their own errors, the escrow deficiency was necessarily too large for Plaintiffs to address in a single lump sum payment.

117.    Ocwen thereafter refused to acknowledge responsibility for the escrow accounting and billing errors and refused to work with Plaintiffs on a plan to pay the back due escrow amounts under a manageable plan. Instead Ocwen exacerbated the default by refusing to accept further payments of principal and interest that the Plaintiffs were at all times willing and able to make.

118.    A true and correct copy of Ocwen's October 11, 2011, letter rejecting monthly payments is attached as Exhibit E.

### *Ocwen's Improper Imposition of Late Fees Post-Acceleration*

119.    Litton sent Plaintiffs a Notice of Default and Intent to Accelerate dated July 18, 2011, informing them that it intended to exercise the lender's right under the mortgage to accelerate the loan if Plaintiffs did not cure an alleged default in the amount of $7,305.81 within 45 days of the Notice – or September 1, 2011.

120.    A true and correct copy of the July 18, 2011, Notice of Default and Intent to Accelerate is attached as Exhibit F.

121.    The Notice of Default and Intent to Accelerate dated July 18, 2011, instructs Plaintiffs as follows:

> To cure this default, you must pay all amounts due under the terms of your Note and Deed of Trust/Mortgage. As of July 18, 2011, the total amount necessary to bring your loan current is $7,305.81. Addition amount may become due and payable under your Note and Deed of Trust/Mortgage after July 18, 2011…
>
> If you have not cured the default within forty five (45) days of this notice, Litton will accelerate the maturity of the date of the Note and declare all outstanding amounts under the Note immediately due and payable. Your property that is collateral for the Note may then be scheduled for foreclosure in accordance with the terms of the Deed of Trust/Mortgage and applicable state laws.

Exhibit F.

122.    The New Century mortgage contains the following relevant provisions with respect to "Borrower's Right to Reinstate After Acceleration" at Paragraph 19:

> If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to Section 22 of this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue  unchanged unless as otherwise provided under Applicable Law.

Exhibit B.

123.    The New Century mortgage contains the following relevant provisions with respect to "Acceleration; Remedies" at Paragraph 22:

> Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument… The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

Exhibit B.

CLASS ACTION COMPLAINT

124.     The New Century note contains the following relevant provisions with respect to "Late Charge for Overdue Payments" at Paragraph 6(A):

> If the Note Holder has not received the full amount of any monthly payment by the end of 15 calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be 5.00% of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

Exhibit A.

125.     Plaintiffs had not cured the alleged default on or before September 1, 2011, on which date Litton informed them that the lender would exercise its rights of acceleration under the mortgage, which was the same date that Ocwen acquired the servicing rights of the loan.

126.     Although the loan was accelerated at the time, Ocwen continued to assess late charges on Plaintiffs' loan account, which it was not permitted to do under the terms of the note and mortgage.

127.     Ocwen continued assessing late charges on Plaintiffs' loan account even after it filed a foreclosure complaint against them, confirming the lender's election to accelerate the principal balance due.

128.     A true and correct copy of Deutsche Bank's foreclosure complaint filed in the United States District Court, Central District of Illinois (Case No. 12-cv-1176) is attached as Exhibit G.

### *Ocwen's Attempts to Collect Unjustified Prior Servicer Advances*

129.     When Litton transferred servicing of Plaintiffs' loan to Ocwen, it included "Prev-Prior Servicer Fees" in an amount of $917.64.

130.     A true and correct copy of the September, 2011, monthly mortgage statement Ocwen sent to Plaintiffs seeking to collect the "Prev-Prior Servicer Fees" is attached as Exhibit H.

CLASS ACTION COMPLAINT

131.    The September, 2011 monthly statement contains no breakdown or explanation of what the "Prev-Prior Servicer Fees" comprise. Exhibit H.

132.    On information and belief, Ocwen did not receive any proof from Litton that the Plaintiffs owed Litton the $917.64.

133.    These fees are not legitimate under Plaintiffs' mortgage and note, rather, Ocwen is attempting to collect these fees from Plaintiffs as a way to generate illegal and improper revenue for Defendants.

### Ocwen's Improper Force-Placed Insurance

134.    The New Century mortgage contains the following relevant provisions with respect to "Property Insurance" at Paragraph 5:

> Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire [and] hazards…[t]he insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonable….[i]f Borrower fails to maintain any [required] coverages…Lender may obtain insurance coverage, at Lender's option and Borrower's expense.

Exhibit B.

135.    From the outset of the loan in September 2002, Plaintiffs have always maintained and paid for insurance coverage that satisfies the requirements of the mortgage, which payments they made separately and not included in their regular monthly mortgage payments.

136.    Ocwen knew or should have known that Plaintiffs maintained contractually required insurance coverage on the property at all relevant times.

137.    Regardless, Ocwen force-placed insurance coverage on the property at a much higher cost and on less advantageous terms at a significant cost to Plaintiffs or billed the account for insurance that was force-placed by Ocwen.

CLASS ACTION COMPLAINT

138.    On information and belief, some or all of the force-placed insurance policies that Ocwen obtained on Plaintiffs' property was obtained from Altisource and was purchased by Ocwen at a price that exceeded the charge for force-placed insurance available from reputable carriers on the open market.

139.    Ocwen's imposition of force-placed insurance on Plaintiffs' loan account caused Plaintiffs to fall further into default and ultimately into foreclosure.

### *Ocwen's Imposition of Inflated Fees and Costs for Foreclosure-Related Services*

140.    After Ocwen rejected Plaintiffs' monthly payments, it began to assess unjustified default and foreclosure related fees on their account, further increasing the amount of the default.

141.    In October, 2011, Ocwen sent Plaintiffs a monthly statement dated October 17, 2011 seeking to collect the following default and foreclosure fees:

- "Prev-Property Inspection Fee" in the amount of $10.50; and

- "Prev-Property Valuation Expense" in the amount of $100.00.

142.    A true and correct copy of the October 17, 2011, monthly statement is attached as Exhibit I.

143.    The New Century mortgage contains the following relevant provisions with respect to "Protection of Lender's Interest in the Property and Rights Under this Security Instrument," at Paragraph 9:

> If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument…then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument…
>
> Any amounts disbursed by Lender under this Section 9 shall become additional debt of

Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

Exhibit B.

144.    The New Century mortgage contains the following relevant provisions with respect to "Loan Charges" at Paragraph 14:

> Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees…[l]ender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

Exhibit B.

145.    The default-related fees listed above were not legitimately due and owing and are inflated.

146.    It is *per se* unreasonable for the Defendant's to act in concert to deliberately inflate the charges for default-related fees and costs in order to profit by passing them through to borrowers' accounts.

147.    These fees are not legitimate under Plaintiffs' New Century mortgage and note, rather, Ocwen is attempting to collect these fees from Plaintiffs as a way to generate illegal and improper revenue for Defendants.

148.    Over the next several months, Ocwen continued to impose illegitimate default and foreclosure related fees and costs to Plaintiffs' account and sought to collect them from Plaintiffs.

149.    For example, a monthly statement Ocwen sent to Plaintiffs dated August 17, 2012, seeks to collect the following fees and charges:

- "Prev-FC Thru Title Searches" in the amount of $500.00;

- "Prev-Property Inspection Fee" in the amount of $63.00;

- "Prev-Property Valuation Expense" in the amount of $220.00; and

- "Prev-Title Report Fee" in the amount of $300.00.

150.    A true and correct copy of the August 17, 2012 monthly statement is attached as Exhibit J.

151.    A monthly statement Ocwen sent to Plaintiffs dated February 18, 2013, several months after Deutsche Bank filed its foreclosure complaint, seeks to collect the following fees and charges:

- "Prev-Court" in the amount of $350.00;

- "Prev-FC Thru Service Complete" in the amount of $585.00;

- "Prev-FC Thru Title Searches" in the amount of $500.00;

- "Prev-Lis Pendens/NOPA" in the amount of $57.00;

- "Prev-Property Inspection Fee" in the amount of $94.50;

- "Prev-Property Valuation Expense" in the amount of $330.00;

- "Prev-Special Process" in the amount of $280.00; and

- "Prev-Title Report Fee" in the amount of $375.00.

152.    A true and correct copy of the February 18, 2013, monthly statement is attached as Exhibit K.

153.    Ocwen continued to accrue fees and charges for property inspections and appraisals during the foreclosure process, even though Plaintiffs have and continue to reside in and maintain the property. By the end of 2013, the inspection fees totaled $147.00 and the property valuation expenses totaled $550.00.

CLASS ACTION COMPLAINT

154.    A true and correct copy of the monthly statement Ocwen sent to Plaintiffs dated December 17, 2013, is attached as Exhibit L.

155.    These fees and charges are unwarranted and inflated and are designed to generate revenue for Defendants, rather than to reimburse for any necessary services under the loan contract.

156.    On information and belief, some or all of the inflated fees and costs Ocwen is seeking to collect from the Plaintiffs were charged to Ocwen for services performed by its affilliate Altisource.

***Ocwen's Refusal to Rectify its Errors and Its Business Choice to Force Foreclosure***

157.    Beginning as soon as Ocwen began rejecting their payments in October, 2011, Plaintiffs contacted Ocwen regularly by telephone in attempts to obtain answers about their loan account, to understand why Ocwen was not accepting their payments, and to resolve the alleged default.

158.    Plaintiffs experience with Ocwen's customer service was frustrating and unproductive; many times when they called they were connected with Ocwen representatives working outside the United States and Plaintiffs could not understand them due to language barriers; one time a representative told Plaintiffs that if they did not send all of the money Ocwen was demanding Ocwen would just take their home. On other occasions, call center employees acknowledged that they did not have access to sufficient information or have sufficient authority to resolve Plaintiffs' issues.

159.    In the summer of 2012, Plaintiffs applied for a loan modification, but Ocwen informed them in August 2012, that it could not offer them a modification because, "…the owner of your loan does not allow loan modifications."

160.    A true and correct copy of the August 24, 2012, loan modification rejection letter, with an Ocwen trademark across the top, "HELPING HOMEOWNERS IS WHAT WE DO!" is attached as Exhibit M.

161.    Plaintiffs also sent Ocwen a Qualified Written Request in the summer of 2012, to which Ocwen did not provide a meaningful answer.

162.    On June 4, 2012, Deutsche Bank filed its foreclosure complaint against Plaintiffs.

163.    The foreclosure complaint contains a "Statement as to Defaults," claiming, [t]he Mortgage is in default due to the failure of the mortgagor(s) to pay the monthly installments of principal, interest, and taxes, from June 1, 2011, through the present. There remains an outstanding principal balance of $99,067.64 with interest accruing on the unpaid principal balance at $21.71 per day, plus attorneys fees, foreclosure costs, late charges, advances, and expenses incurred by the Plaintiff as a result of the default." Exhibit G, ¶10(j).

164.    The foreclosure complaint provides no breakdown or explanation of the amounts Deutsche Bank is claiming are due.

165.    Plaintiffs have been in the process of defending against Deutsche Bank's foreclosure complaint.

166.    As of the date that this action was filed, no judgment has been entered regarding Deutsche Bank's foreclosure complaint.

167.    Plaintiffs have made every effort to avoid losing their home where they are raising their children and in which they have invested in its upkeep and improvement over the past 12 years.

## CLASS ACTION ALLEGATIONS

CLASS ACTION COMPLAINT

168.     Plaintiffs bring this action on behalf of themselves and all persons in the United States ("the Class") whose single-family mortgage loans were serviced by Ocwen on or after a date commencing four years prior to the date of this Complaint and who meet the requirements of one or more of the following subclasses:

a.     **Subclass 1**:  individuals who incurred or were assessed late charges after the date on which their loan balance was accelerated such that the balance was due and payable exclusively in full;

b.     **Subclass 2**: individuals who incurred or were assessed one or more of the following charges based on services performed by Altisource for Ocwen – i) force-placed hazard insurance; 2) procurement of an appraisal or broker's price opinion; 3) procurement of title search or title review services; or 4) auction-related services;

c.     **Subclass 3**: individuals who incurred or were assessed an amount denominated a "Prior Servicer Advance" by Ocwen; and

d.     **Subclass 4**: individuals whose mortgage, deed of trust, or loan note specifies creation of an escrow account and for whom either 1) Ocwen did not maintain an escrow account, or 2) Ocwen applied payments to reimburse itself for escrow outlays rather than applying them to principal and interest.

169.     Plaintiffs seek certification of the Class under Federal Rules of Civil Procedure 23(a) and 23(b)(1), (2), and (3).   In the alternative, Plaintiffs seek certification of particular issues related to Ocwen's liability for the practices at issue pursuant to Fed. R. Civ. P. 23(c)(4).

170.     Excluded from the Class are: (a) the Defendants and any of their corporate parents, subsidiaries, affiliates, partners, officers, directors, predecessors, or successors; (b) any judge or judicial official assigned to this matter and his or her immediate family; and (c) the legal representatives, successors or assigns of any such excluded persons or entities.

171.    The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiffs at this time, such information can be ascertained through appropriate discovery, from records maintained by Ocwen and its agents.

172.    Common questions of fact and/or law exist as to all members of the Class. Among the questions of law and/or fact common to the Class are:

a.    Whether the Defendants have engaged in a common course of deceptive, misleading, or unfair conduct, including the acts and practices identified herein in the servicing of loans collateralized by real property and in collecting alleged debts in connection with these loans;

b.    Whether Ocwen engaged in a uniform practice of assessing late fees after acceleration of the loan balance;

c.    Whether Defendants improperly and illegally overcharged class members for force-placed hazard insurance products, inspection fees, appraisals, broker's price opinions, title services and/or auction services;

d.    Whether Ocwen improperly assessed charges for "Prior Servicer Advances" when it has an insufficient basis to establish that such fees are owed;

e.    Whether Ocwen failed to establish and/or properly account for required escrows;

f.    Whether the Defendants engaged in improper debt collection activities in violation of federal and state law;

g.    Whether the Defendants engaged in improper foreclosure activities;

h.    Whether Ocwen systematically misapplied customer payments;

i.    Whether Ocwen breached contracts with customers;

j.    Whether the Defendants have been unjustly enriched;

CLASS ACTION COMPLAINT

k.      Whether the Defendants violated the FDCPA;

l.      Whether the Defendants violated the state consumer protection acts, including the laws of Florida and Illinois;

m.      Whether Plaintiffs and Class members are entitled to the injunctive and equitable relief requested herein, including restitution and rescission of the loan agreements; and

n.      Whether Plaintiffs and Class members have sustained damages, and the proper measure of damages.

173.    Plaintiffs' claims are based on form loan documents, standardized servicing and debt collection practices, form letters, and accounting standards that were used or implemented by the Defendants on a nationwide basis.

174.    Defendants and their principals participated in, controlled and implemented the challenged practices on a uniform basis from their central offices.

175.    There are no substantial individual questions among the class claims, other than the amount of relief each Class member is entitled to receive.   Common questions thus predominate.

176.    Plaintiffs' claims are typical of the claims of the members of the Class, as Plaintiffs and all other Class members sustained harm arising out of the Defendants' common course of wrongful conduct.

177.    Plaintiffs will fairly and adequately represent and protect the interests of the members of the Class, and Plaintiffs have retained counsel competent and experienced in class action, unfair lending, loan servicing, and consumer fraud litigation.

178.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the

CLASS ACTION COMPLAINT

Class which would establish incompatible standards of conduct for the Defendants within the meaning of Rule 23(b)(1)(A).

179.    The Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole within the meaning of Rule 23(b)(2).

180.    Questions of law or fact common to the members of the Class predominate over any questions affecting only individual members within the meaning of Rule 23(b)(3).

181.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Absent a class action, most members of the Class would likely find the cost of adjudicating their claims to be prohibitive, and would have no effective remedy at law.  Separate individual actions would be inefficient from the standpoint of the judicial system.

182.    Each subclass repeats and realleges the aforesaid class action allegations and each meets the criteria for certification in Rule 23.

183.    To the extent that the Court rules that any class claim cannot be decided except under the laws of a particular state, the proposed class and subclasses can further be divided into state-based subclasses for the purposes of that class claim and each resulting state-based subclass also meets the criteria for certification in Rule 23.

## TOLLING OF STATUTES OF LIMITATIONS BY FRAUDULENT CONCEALMENT

184.    Any applicable statutes of limitations have been tolled by the Defendants' continuing, knowing, and active concealment of the facts alleged herein.  Despite exercising reasonable diligence, Plaintiffs and members of the Class could not have discovered, did not discover, and were prevented from discovering, the wrongdoing complained of herein.

185.    In the alternative, the Defendants should be estopped from relying on any statutes of limitations.  The Defendants have been under a continuing duty to disclose the true character, nature, and quality of their financial services and debt collection practices.  The Defendants owed Plaintiffs and other members of the Class an affirmative duty of full and fair disclosure, but knowingly failed to honor and discharge such duty.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
**(Violations of the Fair Debt Collection Practices Act)**
**(15 U.S.C. §§ 1692, *et seq.*)**
**(By Plaintiffs on Behalf of Themselves and the Class**
**as Against The Ocwen Defendants)**

186.    Plaintiffs hereby incorporate the facts alleged in all preceding and subsequent paragraphs.

187.    The Ocwen Defendants are debt collectors within the meaning of the Fair Debt Collection Practices Act ("FDCPA") when they acquire servicing rights and responsibilities when the loan is delinquent.

188.    The Ocwen Defendants violated the FDCPA, 15 U.S.C. §§1692e, 1692f  and 1692f(1), by demanding and collecting late fees and default and delinquency that were not authorized by the contract (mortgage, deed of trust and/or loan notes) and by sending demand letters that contained false, misleading and/or deceptive representations as to the amount of debt including, without limitation, the amount of accrued late charges legally due, the amount of reasonable and actually incurred fees for services including force-placed hazard insurance and Foreclosure-Related Services.

189.    Plaintiffs and the class were damaged as a result of Defendants' violations.

## SECOND CAUSE OF ACTION
### (Fraudulent Concealment)
### (By Plaintiffs on Behalf of Themselves and
### the Class as Against All Defendants)

190.    Plaintiffs hereby incorporate the facts alleged in all preceding and subsequent paragraphs.

191.    The Ocwen Defendants concealed material facts known to them but not to Plaintiffs and the Class members, including, without limitation, the absence of records supporting the amounts claimed due as prior servicer advances.

192.    All Defendants concealed material facts known to them but not to the Plaintiffs about the business relationships among them and that those business relationships caused them to incur above-market rate prices for force-placed hazard insurance and Foreclosure-Related Services.

193.    The Defendants' fraudulent concealment constitute, in effect, misrepresentations of the actual amount due on which the Defendants intended that Plaintiffs and each class member rely.   Plaintiffs and each class member did justifiably rely on the accuracy of Ocwen's representations of the amounts claimed due.

194.    Plaintiffs and the class were damaged as a result of the Defendant's fraudulent concealment.

## THIRD CAUSE OF ACTION
### (Unjust Enrichment)
### (By Plaintiffs on Behalf of Themselves
### and the Class as Against All Defendants)

195.    Plaintiffs hereby incorporate the facts alleged in all preceding and subsequent paragraphs.

CLASS ACTION COMPLAINT

196.    By its wrongful acts and omissions, the Defendants have been unjustly enriched at the expense of Plaintiffs and the Class, and thus Plaintiffs and the Class have been unjustly deprived.

197.    Plaintiffs and Class members: (a) conferred a benefit on Defendants, which had knowledge of the benefit; (b) Defendants voluntarily accepted and retained the benefit; and (c) under the circumstances it would be inequitable for Defendants to retain the benefit without paying for it.

198.    Plaintiffs and Class members do not have an adequate remedy at law.

199.    By reason of the foregoing, Plaintiffs and the members of the Class seek restitution from Defendants, and an order of this Court disgorging all profits, benefits, and other compensation obtained by Defendants from their wrongful conduct.

**FOURTH CAUSE OF ACTION**
**(Breach of Loan Contracts)**
**(By Plaintiffs on Behalf of Themselves**
**and the Class as Against the Ocwen Defendants)**

200.    Plaintiffs hereby incorporate the facts alleged in all preceding and subsequent paragraphs.

201.    Ocwen assumed the obligations of the Plaintiffs' loan agreements and those of the class when it took over the servicing of their loans.

202.    Ocwen is in privity with each Plaintiff and member of the Class.

203.    By charging late fees after acceleration, Ocwen breached Loan Contracts with Plaintiffs and members of Subclass 1.

204.    By charging for force-placed hazard insurance and Foreclosure-Related Services in amounts that were neither reasonable nor necessary, Ocwen breached Loan Contracts with Plaintiffs and members of Subclass 2.

CLASS ACTION COMPLAINT

205.    By charging prior servicer advances without a reasonable basis to believe that they were due and owing, Ocwen breached Loan Contracts with Plaintiffs and members of Subclass 3.

206.    By failing to establish and properly maintain contractually required escrow accounts, Ocwen breached Loan Contracts with Plaintiffs and members of Subclass 4.

207.    Ocwen further breached the Loan Contracts with Plaintiffs and members of Subclass 4, by applying payments which, by contract, were required to be credited to principal interest, to reimburse itself for escrow advances.

208.    Ocwen's breaches of contract are in violation of the common law of contract of the State of Florida, from where Ocwen's policies in breach of contract originated, and/or the contract laws in every state in which Ocwen does business.

209.    As a result of Ocwen's wrongful conduct, Plaintiffs and the members of the Class have suffered and continue to suffer damages in an amount to be determined according to proof at time of trial, including attorney's fees and reasonable costs.

<u>**FIFTH CAUSE OF ACTION**</u>
**(Breach of the Covenant of Good Faith and Fair Dealing)**
**(By Plaintiffs on Behalf of Themselves and**
**the Class as Against the Ocwen Defendants)**

210.    Plaintiffs hereby incorporate the facts alleged in all preceding and subsequent paragraphs.

211.    The subject Loan Contracts between Plaintiffs and members of the Class on one hand, and Ocwen on the other, included a duty of good faith and fair dealing.  Pursuant to an implied covenant in the subject Loan Contracts, Ocwen had a duty not to do anything that would deprive Plaintiffs and members of the Class of the benefits of those contracts, and had a duty to

do everything that the contracts presupposed each of the parties would do to accomplish the purpose or purposes of the subject contracts.

212.    The Ocwen Defendants acted in breach of the implied covenant of good faith and fair dealing, and their duties thereunder.

213.    Ocwen's breaches of the covenant of good faith and fair dealing are in violation of the common law of contract in the State of Florida, from where Ocwen's policies in breach of the covenant originated, and/or the contract laws in every state in which Ocwen does business.

214.    As a result of Ocwen's wrongful conduct, Plaintiffs and members of the Class have suffered and continue to suffer economic losses and other damages.

<u>**SIXTH CAUSE OF ACTION**</u>
**(Violation of the Florida Deceptive and Unfair Trade Practices Act As Against All Defendants)**
**(Ch. 501, Par II, Fla. Stat)**

215.    Plaintiffs hereby incorporate the facts alleged in all preceding and subsequent paragraphs.

216.    This is an action for actual damages and injunctive relief or declaratory relief pursuant to Chapter 501, Part II, *Fla. Stat*., the "Florida Deceptive and Unfair Trade Practices Act" ("FDUTPA").

217.    At all times material hereto, Plaintiffs and Class members were "consumers" within the meaning of FDUTPA, and Defendants have engaged in "trade or commerce" within the meaning of FDUTPA.

218.    Section 501.204(1) of FDUTPA imposes a duty on Defendants to refrain from engaging in "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce."

CLASS ACTION COMPLAINT

219.     Section 501.211 of FDUTPA provides consumers with a private right of action for FDUTPA violations.

220.     Based on the foregoing course of conduct alleged throughout this Complaint, Defendant have engaged in representations, acts, practices or omissions that are material and that are likely to mislead consumers acting reasonably under the circumstances. Thus, Defendants have engaged in deceptive acts or practices in violation of § 501.204(1), *Fla. Stat.*

221.     Moreover, based on the foregoing course of conduct alleged throughout this Complaint, Defendant have committed acts or practices in trade or commerce that offend established public policy and are unethical, oppressive, unscrupulous or substantially injurious to consumers; or Defendant have committed acts or practices which have caused, or are likely to cause, consumer injury, which is substantial, not outweighed by any countervailing benefits to consumers or competition that the practice produces, and an injury that consumers themselves could not reasonably have avoided. Therefore, Defendant have engaged in unfair acts or practices in violation of § 501.204(1), *Fla. Stat*.

222.     And as set forth above throughout the Complaint, consumers, including Plaintiffs and the Class, have suffered losses and been aggrieved and thus incurred actual damages or are entitled to injunctive relief and/or declaratory relief as a result of Defendants' unfair or deceptive acts or practices in violation of FDUTPA, in an amount or extent to be determined at trial.

## SEVENTH CAUSE OF ACTION
### (Violation of the Illinois Consumer Fraud Act)
### (815 ILCS 505/2)
### (By Plaintiffs on Behalf of Themselves and a Subclass of Illinois Residents [the "Illinois Subclass"] as Against All Defendants)

223.     Plaintiffs hereby incorporate the facts alleged in all preceding and subsequent paragraphs.

CLASS ACTION COMPLAINT

224.    Defendants engaged in unfair and deceptive acts and practices, in violation of § 2 of the Illinois Consumer Fraud Act, 815 ILCS 505/2, by making demands for payment not allowed by law.  Such conduct was carried out in the course of trade and commerce, and for the purpose of inducing the Illinois Plaintiffs and the Illinois Subclass to rely on Defendants' demands.

225.    Illinois Plaintiffs and the Illinois Subclass were injured as a result of Defendants' intentional and malicious conduct.

226.    Illinois Plaintiffs and the Illinois Subclass are entitled to relief for damages suffered by virtue of the Defendants' violations of the Illinois Consumer Fraud Act.

### EIGHTH CAUSE OF ACTION
**(Declaratory and Injunctive Relief)**
**(By Plaintiffs on Behalf of Themselves**
**and the Class as Against All Defendants)**

227.    Plaintiffs hereby incorporate the facts alleged in all preceding and subsequent paragraphs.

228.    Pursuant to 28 U.S.C. §2201 this Court may "declare the rights and legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." Under 28 U.S.C. §2202 the Court may award "[f]urther necessary or proper relief based on a declaratory judgment or decree may be granted, after reasonable notice and hearing, against any adverse party whose rights have been determined by such judgment."

229.    Plaintiffs, individually and on behalf of all those similarly situated, are in doubt as to their rights *vis-à-vis* their Loan Contracts and Defendants' responsibilities to service them fairly and lawfully.

230.     As set forth above, common law and federal statutes create duties for Defendants that they owe to Plaintiffs and Class members and they create legal rights for Plaintiffs and Class members.

231.     There is a bona fide, actual, present, practical need for the Court to declare these rights. There is an on-going dispute that has given rise to and will in the future give rise to injury to Plaintiffs and Class members.

232.     As set forth above, Plaintiff individually and on behalf of other Class members alleges that Defendants have violated the foregoing common law and statutory duties they owe to Plaintiff and Class members, injured Plaintiff and Class members thereby, and violated one or more cognizable legal rights Plaintiff and Class members possess. Defendants' violations of these rights are on going.  On each cause of action stated above, Plaintiffs and the Class will be irreparably injured in the future by the Defendants' misconduct.

233.     Plaintiffs, on behalf of themselves and all Class members, seek a judgment declaring that the Defendants must cease the activities described herein, and provide adequate procedures and policies for the immediate and complete refund of the improper charges and unlawfully assessed and/or for correction of borrower accounts.

234.     Plaintiffs and the Class members do not have a plain, adequate, speedy, or complete remedy at law to address the wrongs alleged in this Complaint, and will suffer irreparable injury as a result of the Defendants' misconduct unless injunctive and declaratory relief is granted.

235.     Plaintiffs for themselves and each subclass also seek declaratory relief pursuant to Chapter 86, Florida Statutes, Statutes (the "Florida Declaratory Judgment Act") to the extent allowed by law to determine whether Defendants' conduct as described herein violates the Loan

Contracts and/or other applicable law. They further seek such relief to determine their legal obligation to repay sums at issue that remain posted to their Ocwen accounts.  Ocwen has refused and continues to refuse to act to address the legitimacy of the challenged assessments to the Plaintiffs account.

236.    By reason of the foregoing, Plaintiffs and the Class members are entitled to a federal or state law declaratory judgment and/or to injunctive relief as set forth herein, together with incidental monetary relief attendant to the declaration of their rights and/or the injunction.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves and all members of the Class and the Subclasses request judgment and relief as follows:

1.    Certification of the case as a class action on behalf of the proposed Class, and designation of Plaintiffs as representatives of the Class, and their counsel of record as Class Counsel;

2.    Certification of the case as a class action on behalf of the proposed Subclasses, and designation of Plaintiffs as Subclass representatives, as applicable, and their counsel of record as Subclass Counsel;

3.    Restitution and disgorgement according to proof;

4.    Accounting;

5.    Declaratory and injunctive relief against Defendants to prevent future wrongful conduct together with monetary relief incidental thereto;

6.    Actual, statutory, exemplary and/or punitive damages according to proof;

7.    Prejudgment interest at the maximum legal rate;

8.    Costs of the proceedings herein;

9.    Reasonable attorneys' fees; and

10.    All such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs and all members of the Class hereby request trial by jury as to all issues so triable.


Dated: September 22, 2014                    Respectfully submitted,

                                             */s/ Steven R. Jaffe*
                                             Steve R. Jaffe (FBN 39770)
                                             E-mail: seth@pathtojustice.com
                                             Mark Fistos (FBN 909191)
                                             E-mail: mark@pathtojustice.com
                                             Seth M. Lehrman (FBN 132896)
                                             E-mail: seth@pathtojustice.com
                                             FARMER, JAFFE, WEISSING,
                                             EDWARDS, FISTOS & LEHRMAN, P.L.
                                             425 N. Andrews Ave., Suite 2
                                             Fort Lauderdale, FL 33301
                                             Telephone: 954-524-2820
                                             Facsimile: 954-524-2822

                                             Gary E. Klein (to seek admission *pro hac vice*)
                                             Email: klein@kkcllp.com
                                             Shennan Kavanagh (to seek admission *pro hac vice*)
                                             Email: kavanagh@kkcllp.com
                                             Kevin Costello (to seek admission *pro hac vice*)
                                             Email: costello@kkcllp.com
                                             KLEIN KAVANAGH COSTELLO, LLP
                                             85 Merrimac Street
                                             Boston, MA 02114
                                             Telephone: 617- 357-5500

                                             Craig E. Rothburd (FBN 0049182)
                                             Email: crothburd@e-rlaw.com
                                             CRAIG E. ROTHBURD, P.A.
                                             320 W. Kennedy Boulevard, Suite 700
                                             Tampa, FL 33606
                                             Telephone: 813- 251-8800

                                             *Attorneys for Plaintiffs*